Glendoval J. Stephens (GS0903)
THE STEPHENS LAW FIRM PLLC
305 Broadway, Suite 1200
New York, NY 10007
Telephone: (212) 385-1400
Facsimile: (212) 385-1401
gjs@stephenslawny.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X    Case No.

SIMONE FORD,

            Plaintiff,         **COMPLAINT**

      -against-              **Jury trial Demanded**

THE PARTNERSHIP FOR THE HOMELESS, INC.,
ARNOLD COHEN, in his professional and individual
capacities, AINE DUGGAN, in her professional and
individual capacities, and MARIO McMICHAEL, in his
professional and individual capacities.

             Defendants.

----------------------------------------------------------------X

    Plaintiff Simone Ford ("Plaintiff" or "Ms. Ford"), by her attorneys, The Stephens Law

Firm PLLC, alleges:

### NATURE OF THE CASE

    1.   This action is brought against Defendant The Partnership for the Homeless, Inc.

("PFTH" or "Defendant"), Mario McMichael ("McMichael"), Arnold Cohen ("Cohen"), and

Aine Duggan ("Duggan") (Collectively, "Defendant" or "Defendants") to redress the deprivation

of rights secured to Plaintiff Simone Ford by the Americans with Disabilities Act of 1991, as

amended 42 U.S.C. §§ 12101, *et seq.* ("ADA"); the New York Human Rights Law, N.Y. EXEC.

LAW § 290 *et seq.* ("NYHRL"); the Administrative Code of the City of New York; and the laws

of the State of New York .

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over Plaintiff's ADA claims pursuant to 28 U.S.C. §§ 1343 and 1331, because the claims arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.  This Court has supplemental subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a), because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and 42 U.S.C. § 2000e-5(f)(3), because Defendants reside, have offices, conduct business, and can be regularly found in this District, and because the causes of action arose and the acts and omissions complained of occurred in this District.

## PARTIES

4.      Plaintiff resides in Queens, New York.

5.      Plaintiff was employed by Defendants in New York, and all relevant actions occurred in New York.

6.      Defendant PFTH is a New York domestic not-for-profit corporation with its principal place of business at 305 7th Avenue, New York, New York 10001.

7.      PFTH employs over 15 employees.

8.      PFTH provides services for the homeless and persons at risk of homeless throughout the City of New York.

9.      Upon information and belief, PFTH's annual operating budget is in excess or one

one million dollars.

10.     At all relevant times, Defendant McMichael was the Director of the Economic Opportunities Program at PFTH.  The offices of McMichael were at 305 7th Avenue, New York, New York 10001.

11.     At all relevant times, Defendant McMichael supervised Plaintiff at PFTH.

12.     At all relevant times, Defendant McMichael set employment policies and controlled significant functions of PFTH's business, and was personally responsible for much of the discriminatory conduct set forth herein, and met the definition of an "employer" under all applicable statutes.

13.     At all relevant times, through December 2019, Defendant Cohen was the Chief Executive Officer at PFTH.  The offices of Cohen were at 305 7th Avenue, New York, New York 10001.

14.     At all relevant times, through December 2018, Defendant Cohen supervised Plaintiff at PFTH.

15.     At all relevant times, through December 2018, Defendant Cohen set employment policies and controlled significant functions of PFTH's business, and was personally responsible for much of the discriminatory conduct set forth herein, and met the definition of an "employer" under all applicable statutes.

16.     Beginning in January 2019, and at all relevant times thereafter, Defendant Duggan was the Chief Executive Officer at PFTH.  The offices of Duggan were at 305 7th Avenue, New York, New York 10001.

17.     At all relevant times beginning in January 2019 and thereafter, Defendant Duggan supervised Plaintiff at PFTH.

18.     At all relevant times beginning in December 2019 and thereafter, Defendant Duggan set employment policies and controlled significant functions of PFTH's business, and was personally responsible for much of the discriminatory conduct set forth herein, and met the definition of an "employer" under all applicable statutes.

## CONDITIONS PRECEDENT

19.     In March 2019, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") against Defendant, which satisfied the requirement of 42 U.S.C. § 2000e-5.  This filing was made within 300 days of all alleged ADA violations by Defendant.

20.     On August 27, 2020, the EEOC issued Plaintiff a Notice of Right to Sue in which the EEOC found reasonable cause and notified Plaintiff of her right to sue.  (A true and correct copy of the Notice of Right to Sue is attached hereto as Exhibit 1.)

21.     This Action is being commenced within ninety (90) days of receipt of the said Notice of Right to Sue.

22.     At or before the commencement of this action, notice thereof was provided to the Attorney General of the State of New York, as provided by NY CIV. RIGHTS LAW § 40-d.

23.     Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission of Human Rights and the New York City Law Department Office of the Corporation Counsel within ten (10) days of its filing.

## FACTUAL ALLEGATIONS

24.     In or around 1999, Ms. Ford was diagnosed with rheumatoid arthritis, a debilitating chronic inflammatory disorder that causes significant joint pain, disfigurement, and loss of function while also involving damage to a wide variety of body systems, including the

skin, eyes, lungs, heart, and blood vessels.

25.     In or around 2013, Ms. Ford was diagnosed with systemic lupus erythematosus ("lupus").  Like rheumatoid arthritis, lupus is a severe and debilitating autoimmune condition that causes severe damage to body systems and organs, including internal organs, skin, and joints.

26.     After her diagnosis with lupus, Ms. Ford's physical condition began worsening. In particular, her hands became increasingly misshapen, rendering it increasingly difficult for her to perform many daily tasks.  Ms. Ford had trouble holding on to objects and began dropping things.

27.     Ms. Ford has been under medical care for her rheumatoid arthritis and lupus since her initial diagnosis.

28.     Defendant PFTH hired Plaintiff on or about December 9, 2016, in the position of Career Pathways Coordinator for the Economic Opportunities Program ("EOP") at the company's facility at 305 7th Avenue, New York, New York.

29.     Ms. Ford's work schedule as Career Pathways Coordinator was Monday through Friday, 8:00 a.m. to 4:00 p.m.

30.     At the time she began working for Defendant PFTH, Ms. Ford was able to perform all the tasks of her position without assistance.

31.     Approximately three or four months after she began working for PFTH, Ms. Ford's condition began to worsen significantly. More particularly, her hands began deforming at an increasing rate.

32.     Prior to working at PFTH, Ms. Ford was able to perform her typing tasks without the need for external aids.  She began having difficulty with these tasks about six months after

starting at PFTH.

33.     In addition to the difficulty in using her increasingly mangled hands to perform her typing duties, Ms. Ford experienced extreme pain, swelling, stiffness, and general discomfort that rendered typing physically uncomfortable.

34.     Typing caused piercing, debilitating pain to Ms. Ford's hands.  Likewise, Ms. Ford could not hold a pen.

35.     When this began occurring, Ms. Ford notified Defendants of her rheumatoid arthritis and lupus diagnosis and the deteriorating condition of her hands.

36.     Throughout the time Ms. Ford worked as Career Pathways Coordinator for the EOP, she reported directly to Defendant McMichael.

37.     Beginning in early 2017, Ms. Ford made a series of requests of McMichael to either eliminate the typing part of her job duties or to obtain a hands-free dictation device to allow her to type without the use of her hands.  McMichael responded to her initial request by saying that he would "look into it."

38.     In or about April 2017, in response to one such request by Ms. Ford for a dictation device, McMichael told Ms. Ford she could have more time to complete typing tasks. Ms. Ford responded that McMichael can extend her more time but eventually she will need a device in order to be able to type.

39.     On another occasion in 2017, Ms. Ford asked McMichael if he had looked into getting a dictation device for her.  McMichael responded that he had, but that the devices were "kind of pricey," stating that PFTH did not have funds in its budget to obtain the device for her.

40.     In or about May 2017, in one of her conversations with McMichael about acquiring a dictation device, McMichael suggested that Ms. Ford pay for the device or have her

insurance cover the cost.  Ms. Ford responded that she shouldn't have to do that because by law PFTH was responsible for accommodating her.  McMichael said nothing in response.

41.     Thereafter, each time Ms. Ford asked McMichael whether he had looked into getting a dictation machine for her, McMichael responded that he had not.

42.     Instead of her requests being accommodated, Ms. Ford was avoided and made to feel like a nuisance.

43.     In late 2017, Ms. Ford in fact looked into the price of a dictation device.  In doing so, she learned that these devices typically consisted of headphones packaged together with dictation software that translated the user's voice into written text.  The prices for the devices Ms. Ford saw at that time ranged from approximately $80 to $150.

44.     In light of McMichael's unresponsiveness to her inquiries, Ms. Ford's inquiries about obtaining a dictation device became less frequent in 2018.

45.     Eventually, Ms. Ford's hands became so deformed that she could only complete her typing tasks with extreme difficulty, pain, and discomfort.

46.     In or about 2018, after consulting with her doctor, Ms. Ford informed Defendants that she would need surgical intervention.  She explained that she would have two surgeries so that both hands would not be fully incapacitated at the same time.

47.     Ms. Ford explained to Defendants that, particularly after her surgery, she would need a dictation device in order to perform her typing tasks.

48.     On February 7, 2019, shortly before her first surgery, Plaintiff was advised that the EOP had exhausted its funding.  She was given the option of taking the position of Landlord-Tenant Liaison with the Housing Department, which entailed a $5,000 salary cut.  Ms. Ford accepted this offer.

49.     In her position as Landlord-Tenant Liaison, Ms. Ford's schedule was Monday through Friday, 9:00 a.m. to 5:00 p.m.  Beginning in September 2019, Ms. Ford was transferred to the position of Housing Specialist She was supervised by Chris Mann, who, in turn, was supervised by Defendant McMichael.  McMichael thus continued to wield full authority over Ms. Ford while she worked in the Housing Department.

50.     Ms. Ford's first surgery took place on February 27, 2019.

51.     For the approximately two years prior to her first surgery beginning in Spring 2017, Ms. Ford's repeated requests for the merest accommodation of a dictation device costing well under $200 was met with indifference and inaction by Defendants.

52.     As a result of Defendants' inaction, in March 2019, Plaintiff filed a charge of discrimination with the federal Equal Employment Opportunity Commission ("EEOC") alleging violation of the ADA.

53.     Plaintiff returned from her first surgery on April 12, 2019.  When she did, she found a dictation device on her desk.

54.     Dictation software was installed in Ms. Ford's computer for dictation. However, Ms. Ford was not afforded training to use the dictation software and, when she inquired about training, she was told to Google it.

55.     In addition to a dictation device, Plaintiff was met with hostility by Defendants upon her return to work.

56.     On the date of Ms. Ford's return to work, Defendant McMichael hovered around Ms. Ford's desk and made several attempts to engage her in conversation over her EEOC charge. Ms. Ford refused to discuss the matter.

57.     In the ensuing months in 2019, at least in part in response to her continued need

for accommodation due to her disabilities, and despite having received no disciplinary action in the preceding two years, Ms. Ford was subjected to several warnings and write-ups.

58.     On or about July 8, 2019, Ms. Ford was involved in a situation as a result of which she was subsequently wrongfully accused of leaving PFTH's Brooklyn location without authorization.

59.     On that date, Ms. Ford was at PFTH's Family Resource Center in Brooklyn. While there, Ms. Ford was advised that she had to submit her time sheet right away in order to be paid.  Ms. Ford advised Mercedes Jennings, Housing Supervisor and Ms. Ford's supervisor at the time, that she had to return to 305 Seventh Avenue to get her time sheet and submit it and would call into the meeting when she arrived in Manhattan.  She let Jennings know she might call in a little late due to the travel time required.  Jennings said, "Okay."

60.     Ms. Ford then informed Camille Williams, the Office Manager of the Family Resource Center, and Felix Bermudez, the Receptionist and the Family Resource Center, that she would return to 305 Seventh Avenue to submit her time sheet, and would call in to the meeting.

61.     When Ms. Ford got to Manhattan, she called in for the meeting.  Bermudez advised her that the meeting was already in progress and Jennings would fill her in on what happened.

62.     On or about July 12, 2019, Ms. Ford was approached by Jennings about a matter she wanted to discuss with her.  Ms. Ford explained that she had a previously scheduled pre-surgery doctor's appointment.  At that point, Alex Katsman, Director of Finance, appeared and began verbally berating Ms. Ford, stating that her shift had not ended.  This statement was inaccurate.

63.     Thereafter, Jennings and Katsman presented Ms. Ford of with a write-up accusing

her of leaving PFTH's Brooklyn site without permission.

64.     Ms. Ford's repeated requests for accommodations due to physical therapy and transportation needs were also repeatedly denied.

65.     On August 2, 2019, Ms. Ford had her second surgery.

66.     Prior to the surgery, Ms. Ford needed to speak with Katsman in order to fill out paperwork for the necessary time off.  On four separate occasions over a period of two months, Ms. Ford had scheduled meetings with Katsman.  Each time, Katsman said he didn't have the time for the meeting.  Katsman's tone in doing so was aggressive.

67.     On one occasion, Katsman told Ms. Ford to remind him of the matter as soon as she arrived the next day.  When she did so, Katsman, who was meeting with Camille Williams, said to Ms. Ford, "Who are you to come in here and interrupt our meeting?"  When Ms. Ford said she announced herself and was following Katsman's instructions, Katzman said repeatedly, "You're being rude!"

68.     Prior to Ms. Ford's EEOC charge, Katzman never behaved to Ms. Ford in this manner.  He always treated her with respect, kindness, and consideration.  Thereafter, he consistently treated Ms. Ford with disrespect.

69.     Ms. Katzman returned from her second surgery on September 18, 2019.

70.     As part of her post-operative treatment after each of her surgeries, Ms. Ford was required to undergo rehabilitative occupational therapy.

71.     Ms. Ford's therapy sessions were scheduled three times weekly on Mondays, Tuesdays, and Wednesdays at 6:00 p.m.  In order to reach the therapy sessions on time, she had to leave work at 4:30 p.m.

72.     In light of her therapy sessions, Ms. Ford requested as an accommodation that she

be allowed to return to an 8:00 a.m. to 4:00 p.m. schedule.  This request was refused on the grounds that the 9:00 a.m. to 5:00 p.m. schedule was required.

73.     Nothing in Ms. Ford's job duties required Ms. Ford to maintain a 9:00 a.m. to 5:00 p.m. every workday.

74.     Despite this fact, Defendants refused all requests by Ms. Ford for an accommodation by allowing her to work an 8:00 a.m. to 4:00 p.m. schedule.

75.     As a consequence of Defendants' refusal to allow her to work an 8:00 a.m. to 4:00 p.m. schedule, Ms. Ford was forced to utilize sick time and vacation time in order to leave work early enough to attend her therapy.  Eventually, she attended only one therapy session per week.

76.     As a consequence of the many missed therapy sessions, Ms. Ford's recovery was significantly retarded, and she suffered severe and permanent injuries to her hands, including severe physical pain and deformity and limitation of use, all of which could have been avoided had she been permitted to attend the missed therapy sessions.

77.     After returning from her second surgery, Ms. Ford was unable to use public transportation because of her inability to use her hands safely to secure herself.

78.     Due to this physical limitation, Ms. Ford began utilizing Access-a-Ride, a transportation service provided by the Metropolitan Transportation Authority within New York City for persons with physical limitations.

79.     In order to utilize Access-a-Ride, Ms. Ford must schedule her trip one day in advance of the anticipated trip time.  Rides cannot be scheduled after 5:00 p.m.

80.     On average, Ms. Ford required three to four times as much travel time when using Access-a-Ride as compared to trips on regular public transportation.

81.     In or about October 2019, Defendants introduced universal schedule change

requiring all employees to work one day each week from 11:00 a.m. to 7:00 p.m. Without any input from her, Ms. Ford was scheduled by Defendants to work this schedule each Tuesday.

82. In light of her occupational therapy sessions and transportation limitations, Ms. Ford immediately and repeatedly requested, but was repeatedly denied, an accommodation.

83. On November 18, 2019, at about 4:42 p.m., Ms. Ford was advised that there would be two meetings to be held the next day at two different public libraries in Brooklyn.

84. Ms. Ford spoke to both her supervisor Chris Mann and Robin De Jesus, the Senior Housing Specialist, to advise them that she would be unable to arrange transportation to and from the meetings and then back to 305 7th Avenue in Manhattan on such short notice. She repeated these concerns the day of the meetings.

85. In response, on the day of the meetings, Mirkin offered to pay for a cab to return to 305 7th Avenue after the second meeting. Ms. Ford explained that because her Access-a-Ride was pre-arranged, she could not make it back in time from the second meeting, which ended at 4:30 p.m., to catch her Access-a-Ride, nor could she reschedule one for later that evening.

86. Ms. Ford took her scheduled Access-a-Ride to her home after the meeting.

87. Ms. Ford had several communications with Mann and Mirkin regarding this incident.

88. Mirkin, in one of her e-mails, referred to "childcare challenges" in denying Ms. Ford's requests for an accommodation while failing to acknowledge Ms. Ford's disabilities and need for physical therapy.

89. On November 22, 2019, despite her repeated explanations that her physical and transportation needs made it very difficult to comply with the 11:00 a.m. to 7:00 p.m. schedule, Chris Mann, Ms. Ford's direct supervisor at the time, issued a written warning to Ms. Ford for

noncompliance with company policy with respect to the work schedule.

90.     Other than the assertion that it was a universal policy, no legitimate business rationale was offered for the repeated denial of Ms. Ford's request for an accommodation.

91.     Defendants discriminated against and retaliated against Ms. Ford because of her disability, and because she complained of or opposed the unlawful conduct of Defendants related to the above protected class.

92.     As a result of the failure of Defendants to provide the reasonable accommodation of an ADA-compliant dictation headset and software, Ms. Ford suffered extreme physical discomfort while trying to perform her work duties.  The discriminatory treatment, retaliation, and resulting permanently worsened physical disability have resulted in emotional distress, physical pain and suffering, damage to plaintiff's good name and reputation, lasting embarrassment, humiliation, and anguish.

## COUNT I

## AMERICANS WITH DISABILITIES ACT
### (Against Defendant PFTH)

93.     Plaintiff incorporates and realleges each preceding paragraph as though set forth in full herein.

94.     During all relevant time periods, Plaintiff suffered from a disability, as defined by the ADA.

95.     During all relevant time periods, Ms. Ford's rheumatoid arthritis and lupus qualified under the ADA as a physical impairment.

96.     During all relevant time periods, Ms. Ford's rheumatoid arthritis and lupus qualified under the ADA as a physiological disorder, or condition, cosmetic disfigurement or anatomical loss affecting her body systems, including without limitation, her neurological and

musculoskeletal systems.

97. During all relevant time periods, Ms. Ford's rheumatoid arthritis and lupus substantially limited her major life activities, including, without limitation, the performance of manual tasks.

98. The accommodations sought by Ms. Ford were reasonable accommodations that enabled Ms. Ford to perform the essential functions of her employment position.

99. The accommodations sought by Ms. Ford were reasonable accommodations which enabled her to enjoy equal benefits and privileges of employment as other similarly situated employees without disabilities.

100. Ms. Ford was a "qualified individual with a disability" under the ADA and was qualified for her employment position and could perform the essential functions of her job.

101. The accommodations would not have caused an undue hardship on the operation of Defendant's business.

102. Defendant discriminated against Plaintiff on account of her disability in violation of the ADA by failing to make reasonable accommodations to her known physical limitations.

103. Defendant PFTH discriminated against Plaintiff in regard to the terms, conditions, and privileges of Plaintiff's employment, in violation of the ADA.

104. As a direct and proximate consequence of Defendant PFTH's discrimination against Plaintiff on the basis of her disability, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income, including past salary, future salary, and company-sponsored benefits.

105. As a direct and proximate consequence of Defendant PFTH's discrimination against Plaintiff on the basis of her disability, Plaintiff has suffered, and continues to suffer,

substantial non-monetary damages, including, but not limited to, emotional distress, physical disability, pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation and anguish.

106.    Defendant PFTH's conduct was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's protected civil rights, entitling Plaintiff to an award of punitive damages.

107.    There is no fully adequate remedy at law for Defendant PFTH's violation of the ADA.

## COUNT II

### RETALIATION UNDER AMERICANS WITH DISABILITIES ACT
### (Against Defendant PFTH)

108.    Plaintiff incorporates and realleges each preceding paragraph as though set forth in full herein.

109.    SEC. 12203. [Section 503] states, "(a) Retaliation. - No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

110.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

## COUNT III

### NEW YORK HUMAN RIGHTS LAW
### (Against All Defendants)

111.    Plaintiff incorporates and realleges each preceding paragraph as though set forth in full herein.

112.     During all relevant time periods, Plaintiff suffered from a disability as defined by the New York Human Rights Law, N.Y. EXEC. LAW. § 292(21).

113.     The accommodations sought by Plaintiff were reasonable accommodations needed for Plaintiff to perform in a reasonable manner the activities involved in the job, including without limitation, performing her typing tasks.

114.     The requested accommodations would not have caused an undue hardship on the operation of Defendant's business.

115.     Defendants Cohen, Duggan, and McMichael were actively involved in the discrimination against Ms. Ford.

116.     Defendants Cohen, Duggan, and McMichael held managerial and supervisory job positions at Defendant.

117.     Defendants discriminated against Plaintiff on account of her disability in violation of the NYHRL by refusing to provide reasonable accommodations to Plaintiff's known disabilities.

118.     Defendants discriminated against Plaintiff in regard to the terms, conditions, and privileges of Plaintiff's employment, in violation of the NYHRL.

119.     Defendants Cohen, Duggan, and McMichael aided and abetted discrimination against Plaintiff, in violation of the New York Human Rights Law. N.Y. Exec. Law. § 296(6).

120.     As a direct and proximate consequence of Defendants' discrimination against Plaintiff on the basis of her disability, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income, including past salary, future salary, and company-sponsored benefits.

121.     As a direct and proximate consequence of Defendants' discrimination against

Plaintiff on the basis of her disability, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to plaintiff's good name and reputation, lasting embarrassment, humiliation and anguish.

122.    There is no fully adequate remedy at law for Defendants' violation of the NYHRL.

## COUNT IV

### RETALIATION UNDER NEW YORK HUMAN RIGHTS LAW
**(Against All Defendants)**

123.    Plaintiff incorporates and realleges each preceding paragraph as though set forth in full herein.

124.    New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice "[f]or any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

125.    Defendants engaged in an unlawful discriminatory practice by wrongfully retaliating against the Plaintiff.

## COUNT V

### NEW YORK CITY ADMINISTRATIVE CODE
**(Against All Defendants)**

126.    Plaintiff incorporates and realleges each preceding paragraph as though set forth in full herein.

127.    The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because

of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienate or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

128.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, by creating and maintaining discriminatory working conditions and a hostile work environment, and otherwise discriminating against Plaintiff because of her disability.

## COUNT V

### RETALIATION UNDER NEW YORK CITY ADMINISTRATIVE CODE
### (Against All Defendants)

129.    Plaintiff incorporates and realleges each preceding paragraph as though set forth in full herein.

130.    The New York City Administrative Code Tide 8, § 8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter…."

131.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Tide 8, § 8-107(7) by discriminating against Plaintiff because of her opposition to the unlawful employment practices of Plaintiff's employer.

## COUNT VI

### NEW YORK CITY ADMINISTRATIVE CODE
### (Against All Defendants)

132.    Plaintiff repeats and re-alleges each and every allegation made in the above

paragraphs of this complaint as if fully set forth at length.

133. The New York City Administrative Code Title 8, § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

134. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, § 8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

## COUNT VII

### NEW YORK CITY ADMINISTRATIVE CODE
**(Against All Defendants)**

135. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint as if fully set forth at length.

136. Section 8-107(19), entitled Interference With Protected Rights provides that "It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section."

137. Defendants violated the above section as set forth herein.

## COUNT VII

### NEW YORK CITY ADMINISTRATIVE CODE
**(Against All Defendants)**

138. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint as if fully set forth at length.

139. Section 8-107(13) entitled Employer Liability For Discriminatory Conduct By

Employee, agent or independent contractor provides "An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section. b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where: (1) the employee or agent exercised managerial or supervisory responsibility; or (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct." 169. Defendants violated the above section as set forth herein.

140. Defendants violated the above and Plaintiff suffered numerous damages as a result.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a. declaring that Defendants' actions and practices violated the ADA, the NYHRL, and the Administrative Code of the City of New York;

b. permanently enjoining Defendants from engaging in actions or practices that discriminate against any employees or job applicants because of their disability;

c. awarding damages for lost wages to be determined at trial, including all applicable front pay and back pay and reimbursement for any and all lost benefits, together with interest thereon from the time of the initial loss until satisfaction of

judgment as well as with post-judgment interest thereon;

d.  awarding actual damages in an amount to be determined at trial for medical expenses for injuries caused or exacerbated by Defendants, together with interest thereon from the time of the initial loss until satisfaction of judgment as well as with post-judgment interest thereon;

e.  awarding general and compensatory damages to be determined at trial, including but not limited to emotional distress, physical pain and suffering, loss of quality of life, together with interest thereon from the time of the initial loss until satisfaction of judgment as well as with post-judgment interest thereon;

f.  awarding attorney's fees;

g.  awarding costs of suit;

h.  awarding punitive or exemplary damages up to the statutory limits, if any; and

i.  for such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

DATED this 1st day of December 2020.

_____/S/_____
Glendoval J. Stephens (GS0903)
THE STEPHENS LAW FIRM PLLC
305 Broadway, Suite 1200
New York, NY 10007
Telephone: (212) 385-1400
Facsimile: (212) 385-1401
gjs@stephenslawny.com
*Attorneys for Plaintiff*